**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| RAHN TAYLOR, et al., | ) | |
| *Plaintiffs*, | ) | |
| v. | ) | No. 4:24-cv-00034-JMD |
| ST. LOUIS COUNTY, et al., | ) | |
| *Defendants*. | ) | |

## MEMORANDUM AND ORDER

This case concerns an alleged 9-minute delay between when an officer first noticed an inmate's medical symptoms and when medical personnel were called. Cedric Dunn tragically died from an asthma attack while detained in a St. Louis County jail. Defendant Officer Evelyn Hudson was on duty the hour before he died. Around 6:45 a.m., she noticed that Dunn was mumbling, pacing, and had liquid leaking from his nose. Medical staff were called 9 minutes later, at 6:54 a.m., and officials dialed 911 at 6:57 a.m. Paramedics declared Dunn dead a few minutes after arriving. Dunn's family asserts that the alleged delay between when Hudson first noticed symptoms and when medical professionals were called constitutes deliberate indifference in violation of the Constitution.

That argument fails on many fronts. Hudson submitted unrebutted evidence that she called medical staff immediately upon observing Dunn's symptoms. If correct, she was not deliberately indifferent. Unable to refute that evidence with evidence of their own, Dunn's family asserts that Hudson's evidence is inadmissible. But they are wrong. Because the evidence is unrefuted and admissible, there is no genuine dispute that Hudson in fact called medical staff immediately. But even if she had not, Hudson was not a medical professional,

and it would not have been immediately obvious to a layperson that Dunn's symptoms (mumbling, pacing, and a running nose) signified an imminent, fatal asthma attack. At the very least, Hudson is entitled to qualified immunity because there is no precedent clearly establishing that an officer in Hudson's position would have needed to call medical personnel more quickly.

Because the family has not proven an underlying constitutional violation, the family's claims against St. Louis County also fail. Having granted summary judgment or dismissal on all the federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claim.

**Background**

It is Dunn's "family's side of the story" that "matters at this point" because the defendants are the ones moving for summary judgment. *N.S. ex rel. Lee v. Kan. City Bd. of Police Comm'rs*, 35 F.4th 1111, 1113 (8th Cir. 2022). So the Court resolves all factual disputes in the family's favor. Of course, the family still must rely on admissible evidence, supported by adequate record citations. Fed. R. Civ. P. 56(c).

When he entered detention at a St. Louis County jail in June 2016, Cedric Dunn had a documented history of asthma and drug use. A nurse advised Dunn to ask for assistance if his asthma became symptomatic and observed that Dunn was in "no apparent distress" and that his "respiration" was "even and unlabored." ECF 155 at 2. In contrast, Dunn's drug use posed existing problems; he was going through withdrawal. So jail officials placed him on a withdrawal protocol that included progressively reduced doses of medication. They also housed him in a direct-supervision unit for inmates going through withdrawal or experiencing a higher risk of suicide. Officers conducted routine observational tours of the unit.

On the day Dunn died, Officer Evelyn Hudson was one of the correctional officers tasked with monitoring and observing Dunn's unit. She assumed her post and conducted an observational tour of the housing unit around 6:15 a.m. There is no evidence that she saw anything amiss with Dunn at that time.

The parties agree that sometime around 6:45 a.m., Hudson observed Dunn pacing and mumbling, with liquid leaking from his nose. Hudson contends that she had a conversation with Dunn and that Dunn informed Hudson that he was fine, but that she immediately called a nurse anyway. Dunn's family denies that the conversation occurred and denies that Hudson called medical personnel, but as explained below, Dunn's family fails to support that denial with any record evidence.

At 6:50 a.m., another officer also assigned to the unit conducted an observational tour. That officer reached Dunn's cell at 6:54 a.m. Dunn was unresponsive, so the officer told Hudson to call for an emergency response and also ask supervisors to arrive. Nursing staff arrived at 6:57 a.m. and immediately called 911. Dunn was pronounced dead at 7:12 a.m. The autopsy listed the cause of death as an asthma attack.

Dunn's family brought this lawsuit. The plaintiffs include Dunn's father (Rahn Taylor) and Dunn's children (through their adoptive father, Thomas Linhares). The family sued Hudson and St. Louis County for (1) Dunn's wrongful death under Missouri state law, (2) deliberate indifference by Hudson under 42 U.S.C. § 1983, and (3) deliberate indifference by St. Louis County under 42 U.S.C. § 1983. Hudson and St. Louis County move for summary judgment or dismissal of all counts.

## Legal Standard

Through this order, the Court renders judgment on two dispositive motions filed by Hudson and St. Louis County: (1) a motion to dismiss and (2) a motion for summary judgment. The Court thus recites the relevant legal standards for each motion.

St. Louis County's motion to dismiss will be granted if St. Louis County establishes that the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "where the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Blomker v. Jewell*, 831 F.3d 1051, 1055 (8th Cir. 2016) (cleaned up). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). The Court accepts all the factual allegations contained in the complaint as true and reviews the petition to determine whether its allegations establish Dunn's family is entitled to relief. *Twombly*, 550 U.S. at 555–56. "This tenet does not apply, however, to legal conclusions," which "may properly be set aside." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

"Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-movant, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Metro. Prop. & Cas. Ins. Co. v. Calvin*, 802 F.3d 933, 937 (8th Cir. 2015) (citation omitted). Officer Hudson and St. Louis County bear the initial burden to "identify those portions of the record" they believe "demonstrate the absence of a genuine issue of material fact." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (cleaned up). In response, Dunn's family must "set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue." *Hodge ex rel. Farrow v. Walgreen Co.*, 37 F.4th 461, 465 (8th Cir. 2022) (citation omitted). The Court views all disputed facts in "the light most favorable" to Dunn's family. *Torgerson*, 643 F.3d at 1042 (citation omitted).

## Analysis

The Court first assesses whether Officer Hudson is entitled to summary judgment. Next, the Court determines whether Dunn's family has a valid claim against St. Louis County. The Court concludes by assessing whether to exercise supplemental jurisdiction over the remaining state law claim.

### I.

Dunn's family presses a claim against Hudson under 42 U.S.C. § 1983 for deliberate indifference to Dunn's serious medical need. Precedent has interpreted the Due Process Clause of the Fourteenth Amendment to prohibit officers from being deliberately indifferent to the serious medical needs of pretrial detainees. *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004). Hudson is entitled to summary judgment on this claim.

The theory of liability that Dunn's family presses is not easy to discern. The family failed to comply with the Court's order to "file a *joint* motion of undisputed facts." Standing Order at 5 (emphasis added).[1] And the theory is not fully clear in their briefs. So the Court has had to piece together their theory from various filings. The Court has generally relied only on the cited materials for the family's theory. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

As best as the Court can tell, Dunn's family presses the following theory of liability. When Hudson arrived for duty around 6:15 a.m., the previous officer informed her that Dunn had been experiencing drug-withdrawal symptoms during the evening and that she should keep an eye on him. There is no evidence that Hudson observed anything amiss with Dunn when she conducted her observational tour around 6:15 a.m. But around 6:45 a.m., Hudson observed Dunn pacing and mumbling, and she saw that he had liquid dripping from his nose.

---

[1] https://www.moed.uscourts.gov/sites/moed/files/judges/requirements/jmd.pdf

The family does not say where Hudson was when she learned this information: on an observational tour, back at her desk, or somewhere else. The family believes that these symptoms should have prompted "immediate assessment for respiratory compromise" because Dunn had "a known history of asthma." ECF 156 at 6. And the family insists that Hudson did nothing for several minutes. Finally, Hudson's alleged failure to immediately call for medical service meant there was as much as a 9-minute delay between when medical personnel could have been called (6:45 a.m.) and when they were in fact called (6:54 a.m.). Hudson is entitled to summary judgment because this theory fails for many reasons.

**A.**

First, the theory fails because it rests on an incorrect assumption about the admissibility of record evidence. The family lacks any affirmative evidence that Hudson took no action in response to observing Dunn's condition. The family of course has the burden of proof on that issue. Lacking affirmative evidence, they say the jury is entitled to infer that Hudson took no action because they believe Hudson also has no affirmative evidence of her own on the issue. As they put it, "[t]here is no admissible evidence . . . that she did anything in response after observing Mr. Dunn's ongoing and concerning symptoms until another officer saw what she had seen several minutes earlier." ECF 158 at 14. That argument fails because there is admissible evidence.

Hudson cites an incident report she created two hours after Dunn's death. ECF 167-2 at 4. The incident report records Hudson's reflection of the incident and states that Hudson was standing at the podium in the housing unit around "6:45" a.m. *Id.* According to the report, Hudson said Dunn's cell door was open for breakfast and that she noticed him pacing and "mumbling." *Id.* She also observed "liquid coming out of his nose." *Id.* When she asked Dunn how he was doing, he replied, "I'm ok, I'm ok, just need a minute." *Id.* Hudson nevertheless immediately called a nurse who said she would check on Dunn. *Id.* When the

nurse did not arrive within a few minutes, Hudson called a supervisor, "ask[ing] her to step in." *Id.*

Unrefuted evidence that Hudson in fact acted is of course a dispositive problem for Dunn's family, who must prove that Hudson did not act, so they assert that this evidence is inadmissible and should be disregarded. Why? Because the incident report includes unsworn statements (including Dunn's statement that he was fine), and they believe "[t]he Eighth Circuit has squarely held that unsworn statements are inadmissible hearsay that cannot be used at the summary judgment stage." ECF 158 at 7. Not so. One case the family cites simply says that a handwritten, unsworn note from a third-party inmate can be hearsay. *Mays v. Rhodes*, 255 F.3d 644, 648 (8th Cir. 2001). The other case simply suggests that bystander statements in a police report may sometimes be hearsay. *Walker v. Wayne Cnty.*, 850 F.2d 433, 435 (8th Cir. 1988) (citing commentary to Fed. R. Evid. 803(6)). Here, in contrast, every aspect of the incident report is admissible either because it is not hearsay or because it is admissible under a recognized exception to hearsay.

Consider first the part of the incident report where Hudson explains her actions, including her decision to call medical personnel immediately after observing Dunn. ECF 167-2 at 4. For purposes of summary judgment, what matters is not whether the statement is presently in an admissible form, but whether it could "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). These are Hudson's own statements subsequently sworn to by her. ECF 167-2 at 2. Clearly, her "version of those events will be admissible at trial through [her] personal testimony." *Walker*, 850 F.2d at 435.

Next, consider the part of the report where Hudson relays her conversation with Dunn. She says that Dunn told her he was fine. At trial, Hudson would be able to testify about that conversation for several reasons. One, Dunn's statement would not be hearsay because it could be offered not "to prove the truth of the matter asserted"—that Dunn was in

fact fine (he was not)—but instead to prove Hudson's subjective belief about Dunn. Fed. R. Evid. 801(c). That would matter because a person cannot be deliberately indifferent to a serious medical need if she is not subjectively aware of that medical need. *Santiago v. Blair*, 707 F.3d 984, 990 (8th Cir. 2013). Two, even if the statement were hearsay, it would be admissible as an exception to the rule against hearsay because it is Dunn's statement about his "then-existing . . . physical condition" or "present sense impression." Fed. R. Evid. 803(1), (3) (capitalization omitted).[2]

This evidence undermines Dunn's family's case. To prevail, they must establish that Hudson took no action in response to the symptoms. *Jones v. Faulkner Cnty.*, 131 F.4th 869, 875 (8th Cir. 2025) ("Even if, in hindsight, [the officer] could have done more, or done it faster, that alone does not amount to deliberate indifference."). Hudson has provided admissible evidence that she in fact immediately contacted medical personnel. To avoid summary judgment, Dunn's family now must respond with affirmative evidence that Hudson in fact did nothing. *See Bedford v. Doe*, 880 F.3d 993, 996–97 (8th Cir. 2018). Dunn's family has cited no affirmative evidence on this issue. Hudson's evidence that she called medical personnel immediately is thus "undisputed for purposes of the motion." Fed. R. Civ. P.

---

[2] The incident report itself likely could be admitted as well as a record of regularly conducted activities, Fed. R. Evid. 803(6). *See, e.g.*, *Stone v. Morris*, 546 F.2d 730, 738 (7th Cir. 1976) ("A prison is clearly a 'business' within the meaning of the term in the statute and the rule, and inasmuch as the memorandum was prepared by a member of the [prison staff] and was lodged in the official prison files, we conclude that it was made in the regular course of prison business activity."); *Clark v. Gross*, No. 4:15-cv-04068-KES, 2016 WL 6638095, at *4 (D.S.D. Oct. 3) ("Fed. R. Evid. 803(6) applies to incident reports generated as a result of jail or prison disturbances."), *report and recommendation adopted*, 2016 WL 6637941 (D.S.D. Nov. 9, 2016).

56(e)(2); *see also* Fed. R. Civ. P. 56(c)(3) (permitting a court to consider only the "cited materials").[3]

Against this, Dunn's family tries to dispute Hudson's evidence that she had a conversation with Dunn. To do so, they cite testimony from their own expert suggesting that the door to Dunn's cell was "closed and locked" when the second officer conducted his observational tour around 6:50 a.m. ECF 155 at 8. And they infer that the door must have been closed minutes earlier, around 6:45 a.m., when Hudson says she had a conversation with Dunn. *Id.*

But even assuming evidence that the door was closed five minutes later is sufficient to create a genuine dispute about whether Hudson had a conversation with Dunn at 6:45 a.m., it does nothing to rebut her evidence that she immediately contacted nursing staff after observing Dunn's symptoms. Dunn's family does not cite contradictory evidence from Hudson, any of the nursing staff (who could have been deposed), or anybody else. Without any affirmative or contradictory evidence of their own, Hudson's evidence is undisputed. Dunn's family "may not simply rest on the hope of discrediting the movant's evidence at trial."

---

[3] The evidentiary issues for Dunn's family extend further. They have not even provided evidence that Hudson knew about Dunn's symptoms at all. Because they are reticent to cite the incident report (which records Dunn's conversation with Hudson), Dunn's family relies on two different citations for their assertion that Hudson had observed Dunn's symptoms. First, they cite an expert report. ECF 156 ¶ 30. But that part of the expert report is not admissible. That part of the expert report recites *Hudson's* observations, not the expert's. ECF 156-8 at 2 ("[Hudson] did observe abnormal behavior (mumbling, pacing, difficulty dressing) and liquid coming from Mr. Dunn's nose."). An expert witness may testify about his or her own observations, as well as expert opinions. *See* Fed. R. Evid. 701–02. The expert has no competency to testify about what Hudson observed.

Second, they cite the deposition of a corporate representative for the proposition that Hudson observed Dunn's symptoms. ECF 156 ¶ 6. But the basis for that corporate representative's testimony was Hudson's statements that she observed Dunn's condition while having a conversation with Dunn. ECF 156-1 at 9.

In other words, Dunn's family lacks any of their own evidence that Hudson observed Dunn's condition. The only evidence they cite (indirectly) is Hudson's evidence, which they simultaneously say is inadmissible.

*United States v. Real Prop. Located at 3234 Washington Ave. N.*, 480 F.3d 841, 844 (8th Cir. 2007) (citation omitted). Their failure to provide affirmative evidence is dispositive.

**B.**

Even assuming that Hudson did nothing from 6:45 a.m. to 6:54 a.m., the claim that Hudson was deliberately indifferent still fails as a matter of law.

One legal element Dunn's family must prove is that Hudson subjectively knew of the seriousness of Dunn's condition. "To create liability," Officer Hudson's alleged "delay in obtaining medical care" for Dunn "must occur in the face of information that a reasonable person would know requires action." *Ruark v. Drury*, 21 F.3d 213, 216 (8th Cir. 1994) (cleaned up). Hudson's "background knowledge" is the core of this question. *Jones v. Minnesota Dep't of Corr.*, 512 F.3d 478, 482 (8th Cir. 2008). But Dunn's family has not cited any record evidence that Hudson subjectively knew of Dunn's asthma. Although medical staff were told by Dunn upon intake about his asthma, Dunn's family cites no record evidence that Hudson was present at intake or later learned about Dunn's asthma condition. At most, Hudson knew that Dunn "had been going through withdrawals from alcohol or drugs" and had "seen medical" previously. ECF 155 at 7.

That matters because under the theory advanced by Dunn's family, Hudson's subjective knowledge of Dunn's asthma is essential. *Vaughn v. Gray*, 557 F.3d 904, 909–09 & n.5 (8th Cir. 2009). Dunn's family does not contend that Dunn's observable condition—mumbling, pacing, and fluid dripping from the nose—by itself would suffice to put an officer on notice that immediate medical attention was required. Instead, Dunn's family presses an "asthma-specific" theory. ECF 156 at 6. They say that these symptoms should have prompted "immediate assessment for respiratory compromise" in a "patient with a *known* history of asthma." *Id.* (emphasis added). But nothing Dunn's family cites from the record

suggests Hudson knew about Dunn's asthma (as opposed to his drug withdrawal), so she cannot be held liable under the family's "asthma-specific," *id.*, theory.

Even if Hudson had known about Dunn's asthma, the claim would still fail. Dunn's family is not complaining about complete denial of medical attention. Instead, they complain that the medical attention was delayed, and delayed only by several minutes. So they must establish not only that Dunn's condition was "so obvious that even a layman would recognize" Dunn needed medical attention, *Leonard v. St. Charles Cnty. Police Dep't*, 59 F.4th 355, 360 (8th Cir. 2023) (cleaned up), but also so obvious to a layperson that a delay of even a few minutes could prove fatal, *Gregoire v. Class*, 236 F.3d 413, 419 (8th Cir. 2000). That standard is satisfied when an inmate is not breathing. *See, e.g.*, *Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001). But here, even Dunn's family tacitly acknowledges that Dunn's symptoms were not symptoms of "classic respiratory distress." ECF 156 at 6. Unlike an unconscious person who is not breathing and has turned a "dark[] shade of blue and purple," *Tlamka*, 244 F.3d at 631, Dunn was pacing and mumbling and had liquid seeping from his nose. Perhaps a person with medical training would recognize those symptoms as signifying imminent, deadly respiratory distress. But it would not be "obvious" to a layperson.

That is especially true because Hudson observed Dunn from a distance. Hudson's evidence is that she saw and observed Dunn while he was in the doorway of his cell and she was at the podium. The podium was on the floor below Dunn's cell. *See* ECF 155-2 (picture of housing unit cell doors); ECF 155 at 3 ("the guard station was below their cells"). Dunn's family cites no record evidence contesting Hudson's statement. And they believe the door was closed. ECF 155 at 8. So Hudson's view would be limited by the door. And if she was at the podium, she at most could see liquid leaking from Dunn's nose while Dunn was standing near the door, and could only do so at a distance, from a floor below, through a narrow window in the cell door. From the perspective of a reasonable officer in that distant situation, a

person standing inside the cell with liquid leaking from his nose would not "so obvious[ly]," *Leonard*, 59 F.4th at 360, need immediate respiratory attention that could not be delayed even nine minutes.

**C.**

At the very least, Hudson is entitled to qualified immunity. Qualified immunity shields Hudson from suit unless Dunn's family can show that (1) Hudson "actually knew" of Dunn's serious medical need but was deliberately indifferent to it and (2) Hudson did not just make "bad guesses in gray areas" but rather "transgress[ed] bright lines," violating a "clearly established constitutional right." *Jones*, 512 F.3d at 484 (cleaned up). This requirement to show that the law is clearly established is steep. It is not enough to prove that some conduct violated the Constitution. Instead, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73,79 (2017) (per curiam) (cleaned up). The relevant precedent must answer the constitutional question with a "high degree of specificity," so that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (cleaned up). In other words, "[t]his demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (cleaned up). For several reasons, Dunn's family cannot overcome qualified immunity.

First, as already explained, Dunn's family has not cited sufficient record evidence to establish that Hudson had subjective knowledge. Dunn's family cites no evidence that Dunn conveyed to Hudson he was in respiratory trouble. And Dunn's family acknowledges that Hudson did not observe "classic respiratory distress." ECF 156 at 6. They instead say that she should have inferred he was in respiratory distress because he had a "known history of asthma." *Id.* But they cite no evidence that Hudson knew Dunn had asthma. "Officers have a strong claim for qualified immunity" when a detainee "do[es] not tell them they are sick" or

has "no obvious physical symptoms" relating to a known need. *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 863 (8th Cir. 2006). As explained above, even though Dunn had symptoms, they did not obviously signify a condition so severe that medical attention could not wait even a few minutes.

Second, Dunn's family has not cited any precedent at a high level of specificity that would have made it clear that Hudson should have done anything differently. To the contrary, comparable cases have found no liability. In one case, for example, the inmate was "unable to stand or walk under her own power, was 'google-eyed' and unresponsive, was rolling on the ground while grunting and groaning, was bleeding from the mouth, smelled as if she had urinated on herself, and was breathing at a very rapid rate." *Jones*, 512 F.3d at 482. The Eighth Circuit held that those symptoms were not "easily recognizable medical issues." *Id.* Similarly, the need for medical treatment was not sufficiently obvious when a pretrial "detainee was found in a creek, soaking wet; was combative; gave nonsense answers to questions; began screaming while in the holding cell; and officers were aware that detainee had taken meth." *Id.* at 482–83 (citing *Grayson v. Ross*, 454 F.3d 802, 809–10 (8th Cir. 2006)).

Here, Hudson allegedly delayed calling for medical care after observing Dunn pacing and mumbling and after observing liquid coming from Dunn's nose. Even if Hudson had been aware of Dunn's asthma, these symptoms do not exhibit an obvious, easily recognizable, emergency respiratory issue under controlling case law. Dunn's family brings their claim under the Fourteenth Amendment, but "the Fourteenth Amendment is not 'a font of tort law.'" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998). Dunn's family must establish that Hudson's actions went well beyond negligence or even gross negligence; they must establish that her actions were so obviously incorrect that her conduct was comparable to criminal activity. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014). No case clearly

establishes that it would have been obvious to a layperson observing these symptoms that Dunn needed emergency respiratory attention that could not be delayed even a few minutes.

Decisions by the Eighth Circuit have likewise held in similar circumstances that delays by correctional officers in providing emergency medical treatment for far longer than 5 or 10 minutes did not amount to deliberate indifference. For example, a jail security officer "who had had training as a paramedic" recognized that there was a respiratory emergency when an individual was "having obvious difficulty breathing." *Ruark*, 21 F.3d at 215 (reporting also that "brown fluid was coming from [the decedent's] nose"). Yet jail officials delayed 20 minutes before calling an ambulance. *Id.* The Eighth Circuit held that a delay of that time, without more, was insufficient to establish liability. *Id.* at 217. In another case, an official delayed 45 minutes after receiving a phone-call tip that an inmate was about to commit suicide. *Gregoire*, 236 F.3d at 418. Although the Eighth Circuit concluded that taking no action in response to a tip "may well constitute deliberate indifference," the officer was entitled to qualified immunity despite a 45-minute delay before checking on the inmate (who did hang himself in that time), because he did eventually take action. *Id.* at 418.

Dunn's family relies heavily on *Tlamka* to support their argument that Dunn had a clearly established constitutional right to receive emergency medical care in 10 minutes or less. ECF 158 at 17–18 (citing *Tlamka*, 244 F.3d at 633). But "*Tlamka*" is "far from on point" and "does not put" Hudson "on notice" that her conduct violated Dunn's rights. *Richardson v. Falk*, 184 F.4th 833, 842 (6th Cir. 2026). "While the 10-minute delay in medical treatment from *Tlamka* is similar in length to the delay attributable to [Hudson], the similarities stop there." *Id.* "[T]he officers in *Tlamka* observed visible signs and symptoms of serious health issues—officers saw the prisoner turning blue and still did not provide medical assistance." *Id.* The officers continued watching and doing nothing as the prisoner lost consciousness. *Id.*

Hudson did not observe Dunn turning blue and then losing consciousness. The symptoms in this case are not even as obvious as those in *Ruark*, which involved a 20-minute delay in emergency medical care after a correctional officer—who had medical training—observed an inmate lying down having difficulty breathing, with "brown fluid" coming from his mouth and nose. 21 F.3d at 215. The symptoms in *Ruark* were more obvious than the ones here—mumbling while standing, pacing, and having fluid leaking from the nose. Yet *Ruark* concluded that no violation of clearly established constitutional law occurred. *Id.* at 217. The Court looks to case law to define the contours of a clearly established right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). And directly on-point Eighth Circuit case law cuts against Dunn's family's position. *See Ruark*, 21 F.3d at 215–17.

*Tlamka* does not even support the conclusion that a correctional officer's 10-minute delay in calling in an emergency violates the Constitution. There, the Eighth Circuit carefully acknowledged that a delay of longer than 10 minutes is "insufficient to give rise to a claim of deliberate indifference" in a situation where correctional officers are "unaware of the serious nature of the inmate's condition" and have "no knowledge their delay risked harm to the inmate." *Tlamka*, 244 F.3d at 634 n.5 (citing *Ruark*, 21 F.3d at 217–18). That is precisely this case. Dunn's family has not presented evidence that Hudson was aware of Dunn's asthma condition at all, much less the serious nature of it. Dunn's family has therefore failed to establish that Hudson violated any clearly established constitutional right.

**II.**

Dunn's family also brings a claim under § 1983 against St. Louis County for allegedly deficient policies or training. ECF 119 at 11 (Count III). But this claim must be dismissed because Dunn's family cannot establish that any St. Louis County policy or training measure was the "moving force" behind any constitutional violation. *Marsh v. Phelps Cnty.*, 902 F.3d 745, 752 (8th Cir. 2018). "[I]n order for municipal liability to attach, individual liability first

must be found on an underlying substantive claim." *Johnson v. City of Ferguson*, 926 F.3d 504, 506 (8th Cir. 2019) (en banc) (citation omitted). Because the Court has concluded that Hudson is entitled to summary judgment, there are no claims for individual liability, and the claim against the county fails as a matter of law.

Even if the claim against Hudson did not fail as a matter of law, "there is no causal link" between Hudson's alleged violations and any alleged policy or practice of St. Louis County. *Troupe v. Young*, 143 F.4th 955, 974 (8th Cir. 2025). Dunn's family does not allege that Hudson was relying on any St. Louis County policy or had been trained to delay relaying the emergency nature of a serious medical need to either nursing staff or her supervisor. Instead, Dunn's family's own designated expert, Anthony Callisto, opines that it was due to Hudson's failure to "follow" a "proper protocol" that there was a delay in relaying the emergency nature of Dunn's serious medical needs to the proper authorities and that this failure "was not the product of institutional ambiguity." ECF 145-2 at 32. Dunn's family has not established that any training Hudson received was the moving force behind her alleged delay. So because "there is no causal link" between that underlying claim of individual liability against Hudson and any alleged unconstitutional policy or training by St. Louis County, Dunn's family's § 1983 claim against St. Louis County must be dismissed. *Troupe*, 143 F.4th at 974; *Chatham v. Davis*, No. 11-cv-0650-MJR-SCW, 2013 WL 12181879, at *9 (S.D. Ill. May 10, 2013) ("[T]here is no evidence" that the county's "policies and protocols regarding treatment of asthmatics caused" plaintiff's "injuries.").

**III.**

Having held that summary judgment on all the federal claims in this case is proper, and having considered the "four factors enumerated in the federal supplemental-jurisdiction statute," *Wong v. Minn. Dep't of Hum. Servs.*, 820 F.3d 922, 933 (8th Cir. 2016), the Court declines to exercise supplemental jurisdiction over the remaining claims, which were brought

in Count I under state law for wrongful death. A district court "ordinarily should" decline supplemental jurisdiction when it has dismissed all federal claims. *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 32 (2025); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."). The Court declines to exercise supplemental jurisdiction over the claims under state law.

## Conclusion

Hudson and St. Louis County's motion for summary judgment, ECF 139, is **GRANTED** as to Count II in Plaintiffs' Second Amended Complaint, ECF 114. St. Louis County's motion to dismiss Count III of Plaintiffs' Second Amended Complaint, ECF 128, is **GRANTED** and Count III is **DISMISSED**, with prejudice. The Court declines to exercise supplemental jurisdiction over any claim in Count I, ECF 114. All other pending motions, including but not limited to ECF 142, are **DENIED** as moot.

Dated this 16th day of November, 2026

JOSHUA M. DIVINE
UNITED STATES DISTRICT JUDGE
FOR THE EASTERN AND WESTERN
DISTRICTS OF MISSOURI